PEOPLE v. NEW YORK BUILDING LOAN BANKING CO.

(Supreme Court, Special Term, New York County. June 5, 1909.)

RECEIVERS (§ 194*)—COMPENSATION—COUNSEL FEES.

An attorney, acting as counsel for a receiver after the receiver's resignation, in connection with the receiver's claim for fees and extra allowances, is not entitled to compensation from the trust estate; but the receiver is individually liable therefor.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 194.*]

Action by the People against the New York Building Loan Banking Company. Motions to confirm reports of Thomas F. Conway, referee, in accountings of Charles M. Preston, receiver, and for the fixing of the allowances to be made to the receiver and his counsel. Motions granted.

Edward R. O'Malley, Atty. Gen., for the People.
Charles W. Dayton, Jr., for receiver.
Thomas F. Conway, referee.

DOWLING, J. These are motions to confirm certain reports of Thomas F. Conway, Esq., referee herein, designated "Interlocutory Reports Nos. 2, 3, and 4," in the fourth accounting of Charles M. Preston, Esq., as receiver of the above corporation (covering the period from September 14, 1906, to September 13, 1907), and "Interlocutory Reports 1 and 2" and "Final Report" in the final accounting of said receiver (covering the period from September 14, 1907, to April 23, 1908), and for the fixing of the allowances to be made to said receiver and his counsel. The present application brings up the question of the final settlement of the receiver's accounts upon his retirement from his trust.

At the outset, in view of the importance of the property interests involved, it becomes necessary to briefly sketch the history of the receivership. The New York Building Loan Banking Company, organized under the laws of this state, conducted a very large business,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

receiving deposits from its shareholders and loaning its funds upon real estate security. For reasons not necessary now to detail it became insolvent. In September, 1903, Mr. Preston became temporary receiver of the company, which then had about $35,000 cash on hand. Its assets consisted almost entirely of equities in more than 1,000 parcels of real estate, subject invariably to first, and in nearly every instance to second and third, and sometimes to fourth, prior mortgages, aggregating nearly $5,000,000, and arrears from borrowing members. Interest on these prior mortgages to the amount of about $85,000 and taxes on the premises to the amount of about $75,000 were in default. The mortgagees were insistent upon the payment of interest and taxes, and many of them demanded payment of principal. The foreclosure of these prior mortgages would have practically wiped out the assets of the company. In addition to these arrears there were claims concededly due from the company, amounting to upwards of $80,000, making a total of about $240,000 of their fixed indebtedness, with $35,000 cash and no quick assets on hand to meet it. Furthermore, the insolvency proceedings before Referee Farren and his report disclosed the existence of a condition which might well be termed chaos. A great number of suits and bankruptcy proceedings were brought against the company soon after the appointment of the receiver, who was also confronted by a dismissal of the complaint by default, with $11,000 costs, in the action brought by the Attorney General, in which he had been appointed. This unfortunate complication rendered him functus officio, but mainly through his efforts his duties were immediately continued and the default subsequently set aside. He also opposed successfully the bankruptcy proceedings. That situation was the task which confronted the receiver at the outset. An order was obtained restraining the foreclosure of the prior mortgages, and the receiver succeeded by negotiation with the holders of those mortgages in obtaining an opportunity to realize upon the equities. To the conservation of these equities in New York, Kings, Queens, and Westchester counties, in this state, and in New Jersey, and the defeat of the large disputed claims, alone are due the moneys realized for dividends. The receiver applied for and obtained leave from the court to pay a first dividend of 15 per cent., but the class W shareholders enjoined him from so doing until their claim was disposed of by the Court of Appeals. That appeal having been decided adversely to the appellants, the dividend was paid. A further dividend of 7½ per cent. has since been authorized and paid, and it is expected that a further dividend of 2½ per cent. will be paid. The shares of the company were divided into 15 forms of certificates, distributed among about 12,000 persons; each form of certificate providing for a different contract or liability.

On February 24, 1904, Mr. Preston became permanent receiver, and in November of that year filed his first annual account. Three further annual accounts have been filed, and printed copies of the first, second, third, and fourth annual accountings were by order of the court prepared for the use of all interested parties. Each of these accountings was made pursuant to a special order of the court, and orders of reference thereon were made to Walter S. Logan, Esq., and

at his death to Thomas F. Conway, Esq. All the proceedings on these accountings are on file in the office of the county clerk, which records show that, in addition to the above-mentioned $80,000 of conceded indebtedness, there were claims filed against the receiver for upwards of $2,500,000. Among these were the class D, 1896, shareholders, to the amount of $350,000, who demanded a preference, which demand was sustained by Referee Logan, but upon the opposition of the receiver was denied at Special Term. Class W shares, issued to the amount of about $500,000, demanded payment in full, on the ground that the stock was illegally and fraudulently issued, or, if legally issued, was entitled to participate with the other shareholders. The receiver contended that these shares, being guaranty stock, were not entitled to be paid until all other shares and creditors had been paid in full, which contention was upheld by the Court of Appeals. Members who had served notices of withdrawal, to the amount of nearly $600,-000, claimed to be creditors, and thus entitled to be paid before any other shareholders received dividends. This contention was denied by the courts. Members who had given notes to the amount of nearly $60,000 claimed that the notes were similar to a draft on a savings bank, but were held chargeable in the amount of their notes against their dividends. The claim of Messrs. A. C. and J. P. Eustace for professional services to the company in the amount of upwards of $100,000 was, with the approval of the Attorney General, reduced to about $60,000. The claim of Charles P. Bacon, to the amount of $25,-000, was reduced to about $16,000. Henry A. Taylor claimed that payments by him to the company, in the amount of about $60,000, were obtained by fraud. This claim was defeated, and carried to the Court of Appeals; but the appeal was withdrawn. James Brunton, in three actions brought against the company for libel, demanded, in the aggregate, damages of $475,000. After trial of one or more of these cases his claim was settled for about $2,500. The claim of MacKenzie Schiff, about $450,000, arising out of a contract between the Metropolitan Building Company and the Building Loan Company, was, after a lengthy litigation, defeated. Had class W prevailed in their efforts to share in the fund, about $500,000 would have been added to the sum on which dividends were payable, thus decreasing the dividends to the other shareholders. Had class D, 1896, about $350,000, been preferred, the dividends to the other stockholders would have been reduced about one-half. Had the claim of the withdrawing members, about $600,000, been successful, the other shareholders would have received practically nothing, and the same may be said if class W had succeeded on their claim of fraud.

After the receiver had arranged with the holders of prior mortgages to suspend proceedings, it became necessary for him to foreclose a large number of mortgages held by the company. These were resisted by a number of mortgage members upon many grounds; but all the courts, including the Court of Appeals, sustained the receiver's construction of the obligations of the members under those mortgages. Had these resisting mortgagors succeeded, the fund would have decreased enormously. It would be impracticable to recite every demand and complication involved. It is evident that the success of even half

of the disputed claims presented, and the success of many of the contentions of the members as to their liabilities under their mortgages, would have deprived all of the stockholders of any dividend, and a large majority of them would have been so deprived, had the preferences claimed by certain of the stockholders been successful. The management of the company had been such that its books and real estate transactions as to evidences of title were confused and often unintelligible, and upon passing title to portions of said real estate the receiver was obliged in many instances to bring proceedings against certain individuals who acted as dummies for the company in order to make said titles marketable. The suits and proceedings of the receivership have numbered more than 1,000, and the total amount realized for the trust estate was about $2,600,000. The late Mr. Logan, referee, in his seventh interlocutory report, said:

"The assets were the most difficult of all assets to realize upon—second mortgages on numerous parcels of property, each often of comparatively small value and mortgaged up to or beyond the limit, and equities in other parcels of property heavily mortgaged. Under the statute the receiver could not without special authorization employ more than one attorney, and, even if authorized to employ more than one, such employment would have been of doubtful expediency, and yet no one lawyer and no ordinary law office was capable of doing all the work required. The fact that the investment of the stockholders in the company was unfortunate is not to be considered. Mr. Dayton is not responsible for their misfortunes. On the contrary, his labors have been to save the stockholders as much as possible from the wreck, and his labors have been attended with conspicuous success."

Mr. Conway, the present referee, in his opinion accompanying interlocutory report C, stated:

"While I am compelled to differ quite widely with the judgment of the attorney for the receiver as to the value of his services, it affords me pleasure to be able to state that, after a most painstaking examination of the evidence submitted, the record of the receivership generally, and the often difficult, important, and complicated questions with which he had to deal—many of them new and without precedent—the success and skill of the attorney for the receiver evidenced thereby are as highly creditable to him as they were beneficial to the interests of his client, and as bearing upon the value of his services I have not overlooked the result of his labor or the probable results of the receivership to the shareholders or creditors of the defunct corporation."

Such being the condition of the estate, there had been rendered from time to time accountings of the receiver, which had been referred, as before stated, to the late Walter S. Logan, Esq., and upon his decease to Thomas F. Conway, Esq. Upon the reports of such referees, rendered after an exhaustive and thorough examination, and after the most painstaking and conscientious probing by successive Attorneys General, orders were made confirming the reports, passing and settling the accounts of the receiver, and fixing and determining the amount of the compensation to be paid his counsel. No appeal was ever taken from any one of said orders, and the order of reference made herein April 21, 1908, the form of which was settled upon notice to the then Attorney General, and not objected to by him, expressly provided that the referee should regard as finally passed and stated the three annual accounts theretofore judicially passed upon by orders of this court. Nevertheless, the Attorney General now seeks to reopen the

entire matter and to have the allowances heretofore made reduced. While it may well be that he is estopped from questioning the effect of prior orders not appealed from, and which may well be deemed conclusive, yet it has been deemed advisable to take the ground that the prior orders were not final, and to review the entire record to make sure that full justice had been done to all concerned. An examination has therefore been made of the entire record submitted herein, covering some 6,000 pages of typewritten testimony, taken before both the referees who have acted herein, besides the various reports of the referees heretofore made and filed.

Absolutely not a single reason worthy of serious consideration has been advanced why the prior determinations had herein should now be reversed or modified. The voluminous testimony affords ample justification for the allowances made both to counsel and receiver. No one has ever questioned either the honesty, ability, or efficiency of either counsel or receiver, and the reductions in the claims presented for services have been made without casting any doubt upon their value or extent. Every expenditure made by the receiver was authorized by an order of this court, and, while the amounts may seem large in some instances, they were thought necessary to save the estate and thus enable any dividend whatever to be paid. Expert testimony showing that the services rendered were worth at a fair valuation an amount largely in excess of what the referee finally reported, in view of all the circumstances, as reasonable compensation, was given by members of the bar fully qualified to express an opinion entitled to great consideration. The referee's reports demonstrate the care and ability devoted to the questions involved.

A point made by the Attorney General is that Robert E. Steele, Esq., performed services for which the counsel to the receiver should be charged; but this is precisely what was done, as the record and the referee's opinion disclose that the amount paid Mr. Steele ($2,280 and disbursements) was deducted from the fees allowed the receiver's counsel.

I do not believe that Howard Chipp, Esq., is entitled to any allowance herein. He acted as counsel to the receiver, after the latter's resignation, in connection with the receiver's claim for fees and extra allowances. It seems clear that the receiver is individually indebted to him for whatever services he so performed, and that the amount is not recoverable from the trust estate. I therefore decline to grant him any sum whatever.

Finally, the conclusion is irresistible, from a careful consideration of the record herein, that the motions should be granted, and the orders (notice of presentation whereof has been given to the Attorney General and no objections to the form of which have been made) have been signed.